1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7    JOSE LUIS GODOY, et al.,                  Case No. 15-cv-00883-WHO
              Plaintiffs,
8                                              **ORDER GRANTING MOTION FOR**
         v.                                    **SUMMARY JUDGMENT**
9
                                               Re: Dkt. No. 90
10   COUNTY OF SONOMA, et al.,
              Defendants.
11

12                          **INTRODUCTION**

13          Plaintiffs Jose Luis Godoy, L.M., K.A., and J.C. allege that they were unlawfully detained

14   and subject to excessive force by defendants County of Sonoma and Officers Dylan Fong, Dave

15   Pedersen, and Matthew Lupton in retaliation for plaintiffs' protests over the death of their friend,

16   Andy Lopez.  However, the undisputed facts establish that defendants detained plaintiffs as a

17   result of a 911 call unrelated to the protests and did not use unreasonable force during the incident.

18   I heard argument on defendants' motions for summary judgment on July 6, 2016 and now

19   GRANT defendants' motion for summary judgment.

20                          **BACKGROUND**

21          Plaintiffs were part of a group called "Andy's Youth," composed of Sonoma County

22   residents that participated in protests over the killing of Andy Lopez.  Third Amended Complaint

23   ("TAC") ¶ 20 [Dkt. No. 72].  *Id.*  Officer Fong was aware that individuals who were a part of

24   "Andy's Youth" were present at most of the rallies that occurred after Lopez's death, although he

25   did not know any particular members of that group.  Fong Depo. at 35:12-17, 23-24.

26          On January 9, 2014, a motorist reported that a Hispanic male driving a black Suburban

27   with a partial license plate 5CY___ had brandished a silver firearm at the driver while traveling in

28   the opposite direction.  Freeman Decl., Exh. A at COS00029 ["Fong Incident Report"].  A "be on

United States District Court
Northern District of California

1   the lookout" ("BOLO") was issued for a black Suburban with that partial plate.  At approximately

2   5:30 pm, Deputy Lupton broadcasted that he had observed the vehicle but lost it.  During the time

3   the BOLO was in force, the Santa Rosa Police Department conducted a photo lineup for the

4   victim.  Freeman Decl., Exh. A at COS00004-25.  The victim identified Godoy as the individual

5   who had allegedly brandished the weapon.  *Id.*

6        That day Fong was partnered with Officer Ball.  Fong Incident Report.  They learned that

7   Godoy had a black Chevy Suburban with a license plate that began with 5CY.  *Id.*  While on their

8   way to an unrelated incident, the officers spotted the black Chevy Suburban parked on the wrong

9   side of the street.  *Id.*  Fong observed a group of people walking away from the vehicle and

10  recognized Godoy walking in the middle of the group.  *Id.*  Fong knew of Godoy from seeing him

11  in the media and from his booking photographs.  Fong Depo. at 21:24-22:3.  Fong observed

12  Godoy gesture with one arm as if he were attempting to alarm the vehicle.  Fong Incident Report.

13  He then observed the hazard lights flash on the parked car.  Fong Incident Report; *see also* Dkt.

14  No. 100, Exh. 11 (depicting plaintiffs gathering items from the parked car and the lights flashing

15  on the vehicle as they walk away). [1]

16       Fong determined at this point that Godoy and the other people present with him may have

17  been the suspects related to the BOLO.  *Id.*  He illuminated them with his bright spot lamp, exited

18  the vehicle, and yelled "get on the ground!" and "get on the f—ing ground!"  Freeman Decl., Exh.

19  D. 84:15-86:10; Exh. E 78:6-79:3.  Ball also gave loud commands to get on the floor.  Fong

20  Incident Report.  Fong called for back-up while the officers continued to hold the individuals on

21  the ground until back-up arrived.  *Id.*  Back-up arrived within several minutes.  *Id.*  Meanwhile, a

22  crowd of at least twenty bystanders gathered at the scene.  L.M. Depo. at 49:12-21 [Dkt. Nos. 90,

23  Exh. D; 92-5].

24

25

26

27  ─────────────────────

[1] Defendants' objections to the Declaration of Lizbeth Mendoza and the eleven attachments,
28  including the exhibit associated with the notice of errata (Dkt. No. 100), to plaintiffs' opposition
    brief are OVERRULED.  Dkt. No. 104.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.      GODOY'S DETENTION[2]

Earlier that afternoon, plaintiffs had been making posters related to their protest activities. Immediately prior to the incident, L.M., J.C., K.A., and Godoy arrived at L.M.'s parents' home. Godoy had just parked his car and was crossing the street when a patrol car pulled up with its two bright spot lights on.  Godoy Depo. at 56:10-13, 21-25 [Dkt. Nos. 90, Exh. G; 92-6].  Within a couple of seconds of hearing the officers' commands to get down, he laid down on the street, with the front half of his body behind a parked car.  *Id.* at 60:17-22.

After "a couple of minutes" on the ground he saw additional officers arrive.  *Id.* at 64:19-21.  He believes he was the first person from the group to get handcuffed.  *Id.* at 68:16-18.  He was approached by two officers, one who he thinks was Fong[3] and another unidentified officer.  *Id.* at 69: 9-14.  Godoy also observed the two officers carrying guns before his handcuffs were applied.  *Id.* at 94:10-14.  At the time of his handcuffing, Godoy had his arms out to his side. *Id.* at 86:4-6.  One officer grabbed his wrist "hard" and put it behind his back and did the same with the other wrist.  *Id.* at 89:12-16.  Another officer, who Godoy "is going to say" was Fong, put his knee on Godoy's back.  *Id.* at 86:13-20.  He felt pain in the middle of his back when the knee was place there, which he approximates lasted about 20 seconds.  *Id.* at 90:16-91:7.  One of the two officers involved in the handcuffing asked Godoy, "You think you're tough now?"  *Id.* at 84:19-85:1.  Once he was handcuffed, he was turned over by the officers and placed on his back. *Id.* at 93:4-12.  At some point while Godoy was handcuffed and on his back, Officer Fong placed his hand on Godoy's chest right below his neck.  *Id.* at 106:18-107:3.

Lupton arrived on scene after Fong and Ball.  Godoy recognized Lupton from previously seeing him "at court."  *Id.* at 98:15-99:6.  Godoy remembers reading Lupton's name badge during at least one prior interaction that happened in a courtroom.  *Id.* at 100:10-17.  Godoy testified that although the courtroom interaction primarily involved Lupton and a third party, Lupton's "body expression," including the way he held his gun, made Godoy feel like he was antagonizing him.

---

[2] Defendants and plaintiffs have different version of the events that unfolded that night, but defendants rely on plaintiffs' deposition testimony for purposes of this motion.
[3] Godoy testified during his deposition that he believes he recognized Officer Fong from a previous interaction with him but he did not know for sure.  *Id.* at 76:20-77:3.

United States District Court
Northern District of California

*Id.* at 102: 5-14.  Godoy may have called Lupton a "bitch" during that encounter.  *Id.* at 102:22-24.

While Godoy was being handcuffed, he saw Lupton pointing his gun at him from about ten to fifteen feet away.  *Id.* at 104:13-19.  Lupton was standing behind a parked car, with only his upper body exposed.  *Id.* at 105:21-106:11.  Godoy's deposition testimony concerning whether Lupton continued to point his gun at Godoy after he was handcuffed is inconclusive and inconsistent.  When asked whether he ever saw guns pointed at him after he was ordered down on the ground, Godoy responded that he did not remember.  *Id.* at 95:18-23.  Four minutes later, however, when asked whether he saw any law enforcement officers point a gun at him after he was handcuffed, Godoy answered, "I'm going to say yes" and identified Lupton as someone who did so.  *Id.* at 97:22-98:10.  But shortly thereafter, when Godoy was asked whether he ever saw Lupton after he pointed his gun at Godoy from behind the parked car, which occurred while Godoy was being handcuffed, Godoy said that he "just [didn't] remember."  *Id.* at 106:9-17.

After Godoy was handcuffed, he walked towards the squad car with the officers "dragging" him.  *Id.* at 109:1-5.  They then "placed" or "slammed" him on the trunk of the car and searched him by patting him down and taking everything out of his pockets.  *Id.* at 110:5-22.  After he was searched he was instructed to sit in the squad car, by placing one foot in at a time.  *Id.* at 114:10-14.  Because he did not do so fast enough he was "shoved" in.  *Id.*  As a result of this shove, he hit his head on the door frame.  *Id.* at 122:20-123:4.

Once in the patrol car, Godoy told the officers he needed an ambulance because of his thyroid condition, which raises his blood pressure and makes his heart race in stressful conditions.  *Id.* at 115:2-116:4.  An ambulance arrived and the medical personnel checked him and told him he was okay.  *Id.* at 117:12-19.  He did not tell medical personal about any pain or injuries stemming from his detention.  *Id.* at 123:5-7.

## II.     L.M.'S DETENTION

When L.M. first got out of the car, she did not see any law enforcement vehicles.  L.M. Depo. at 87:7-89:15 [Dkt. Nos. 90, Exh. D; 92-5].  L.M. walked to her parents' home and then after about a minute, she walked back to where the Suburban had been parked.  About a minute after that, a patrol vehicle pulled up with its spotlights on.  Because the bright lights were pointed

4

at her, she could not see the officers clearly and was not sure what was going on. *Id*. at 84:15-25. When she was first ordered to put her hands up she thought somebody was just "playing around." *Id*. at 85:12-15. But after hearing the command repeated and hearing Godoy's instruction to do so, she lay on her stomach with hands behind her head. *Id*. at 89:6-10. Once on the ground, she could see that two officers were pointing guns at them. *Id*. at 85:17-20. She also remembers seeing "a lot of people," at least twenty, on the street during the incident. *Id*. at 49:12-21.

Once on the ground, an officer came to search her bag. *Id*. at 89:16-90:6. Later Lupton, whom she had seen on an earlier occasion, handcuffed her. *Id*. 92:21-94:2; Mendoza Decl. ¶ 4 [Dkt. No. 93]. He did so by taking her right hand from the back of her head to behind her back and doing the same with her left hand. *Id*. at 91:2-18. At first Lupton put on one set of cuffs, but it was too tight for her so he put on two. *Id*. at 97:16-98:1. Instead of having both arms in one set, she had one arm in one set and the other arm in another set and the sets were connected together in the middle. *Id*. at 97:16-20. Lupton then instructed her how to get up and she did so on her own. *Id*. at 98:5-99:10. Once she was standing, another officer walked her over to a patrol car and instructed her to stand near the bumper. *Id*. at 99:3-10. She told an officer nearby that her handcuffs were too tight and the officer loosened them for her. *Id*. at 102:17-24. She was required to wait near the bumper of the patrol car for "more than 30 minutes." *Id*. at 111:18-22.

At some time later, Officer Pederson, whom L.M. recognized because he was her brother's parole officer and she had seen him at a protest, approached her. *Id*. at 104:16-105:7. He took photographs of her, asked for her name and address, and told her he was going to put her in the gang "system." *Id*. at 106:21-107:2.

Following the incident, L.M. saw a doctor somewhere between four and ten times for back pain on her right side. *Id*. at 57:19-25, 59:21-60:2.

### III.   K.A.'S DETENTION

K.A. was walking to L.M.'s house when the patrol car arrived. K.A. Depo. at 78:4-10 [Dkt. Nos. 90, Exh. E; 92-8]. K.A. heard multiple commands to get on the floor. *Id*. at 78:22-79:18. Because of the bright light being shined in her direction, she could not see the officers or what they were doing at that time. *Id*. at 82:8-13. From her experience watching cop shows, she

United States District Court
Northern District of California

5

1    knew that the right thing to do at that moment was to lay down on her stomach, which she did.  *Id.*

2    at 82:23-83:16.  The officers then instructed the group to put their hands on their head, which she

3    did.  *Id.* at 84:5-85:9.

4         While she was on the floor with her hands behind her back, she could hear the officers

5    talking to Godoy and telling him to put his hands behind his back and to stop moving.  *Id.* at

6    87:21-88:8.  Although her vision was limited from her position on the ground, she could see that

7    an officer's hand at some point was on or around Godoy's neck.  *Id.* at 94:8-23.

8         At some time afterward, Lupton approached K.A. to handcuff her.  *Id.* at 97:6-11.  Lupton

9    first grabbed her right hand and pulled it in the "wrong direction."  *Id.* at 98:4-10.  Instead of

10   turning it around, he pulled it straight back from where it was on the back of her head.  *Id.*  She

11   reacted by pulling her arm back and putting it behind her back on her own.  *Id.* at 98:10-17.  She

12   put her left arm behind her back herself.  *Id.* at 98:23-25.  Once she was handcuffed, Lupton

13   assisted her to her feet because she was not able to get up on her own.  *Id.* at 99:4-25.  Lupton

14   asked her if she had anything in her pockets, and after she said she had her phone, he reached into

15   the front pocket of her sweatshirt to pull it out.  *Id.* at 100:14-101:1.  He also patted her down

16   where her pants met her boots.  *Id.* at 101:2-15.  That was the extent of her interaction with Lupton

17   during her detention.  *Id.* at 101:18-21.  Her remaining interactions were with officers whose

18   conduct is not in dispute in this motion.

19        Following the incident, K.A. felt pain in her back muscles when she walked.  *Id.* at 51:5-7;

20   10-22.  She discovered this pain when she went back to school a few days later.  *Id.* at 51:9-15.  A

21   few months after the incident, she went to her family doctor who prescribed her Naproxen, a pain

22   killer, and told her to continue going to her chiropractor.  *Id.* at 36:2-9.

23   **IV.    J.C.'S DETENTION**

24        J.C. had just gotten out of the car and was walking across the street when he saw bright

25   lights from his right side.  J.C. Depo. at 58:1-59:3 [Dkt. Nos. 90, Exh. F; 92-9].  He heard

26   commands to "get on the ground" and "get the f—k on the ground."  *Id.* at 59:10-14.  After

27   hearing the commands he walked two or three more steps and then got on his stomach because he

28   figured it was what he had to do and saw Godoy do so as well.  *Id.* at 61:15-62:12.  From his

United States District Court
Northern District of California

1  position on the ground he was able to see at least two officers, including Fong, with their guns

2  drawn walking towards Godoy.  *Id.* at 65:13-16.  More officers arrived and he observed that all of

3  the officers, at least six, had their guns draw until Godoy had been handcuffed.  *Id.* at 68:11-24.

4  At least one of those officers also had his gun drawn on J.C. until he was handcuffed,

5  approximately 20 seconds.  *Id.* at 70:16-71:7.

6       Lupton was the officer who handcuffed him.  Lupton stepped behind J.C. while he was on

7  the ground and spread his legs with his foot and "dropped his knee into [J.C.'s] lower back."  *Id.* at

8  73:21-24.  Lupton then laughed and handcuffed him.  *Id.* at 73:24-25.  Lupton and a Santa Rosa

9  Police Department officer picked J.C. up and got him on his feet.  *Id.* at 75:8-12.

10      His remaining interactions were with officers whose conduct is not at issue in this motion.

11                              **LEGAL STANDARD**

12      A party is entitled to summary judgment where it "shows that there is no genuine dispute

13  as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

14  dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material where it could affect the

16  outcome of the case.  *Id.*

17      The moving party has the initial burden of informing the court of the basis for its motion

18  and identifying those portions of the record that demonstrate the absence of a genuine dispute of

19  material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Once the movant has

20  made this showing, the burden shifts to the nonmoving party to identify specific evidence showing

21  that a material factual issue remains for trial.  *Id.*  The nonmoving party may not rest on mere

22  allegations or denials from its pleadings, but must "cit[e] to particular parts of materials in the

23  record" demonstrating the presence of a material factual dispute.  Fed. R. Civ. P. 56(c)(1)(A).  The

24  nonmoving party need not show that the issue will be conclusively resolved in its favor.  *See*

25  *Anderson*, 477 U.S. at 248-49.  All that is required is the identification of sufficient evidence to

26  create a genuine dispute of material fact, thereby "requir[ing] a jury or judge to resolve the parties'

27  differing versions of the truth at trial."  *Id.* (internal quotation marks omitted).  If the nonmoving

28  party cannot produce such evidence, the movant "is entitled to...judgment as a matter of law

United States District Court
Northern District of California

United States District Court
Northern District of California

1   because the nonmoving party has failed to make a sufficient showing on an essential element of

2   her case." *Celotex*, 477 U.S. at 323.

3       On summary judgment, the court draws all reasonable factual inferences in favor of the

4   nonmoving party. *Anderson*, 477 U.S. at 255.  "Credibility determinations, the weighing of the

5   evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

6   judge." *Id.*  However, conclusory and speculative testimony does not raise a genuine dispute and

7   is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594

8   F.2d 730, 738-39 (9th Cir. 1979).

9                                    **DISCUSSION**

10      Defendants seek summary judgment on all of plaintiffs' claims because there is no material

11  fact in dispute to contest that the officers' conduct was justified and reasonable.  For the reasons

12  described below, I agree.

13  **I.    42 U.S.C. § 1983 (FIRST AND SECOND CLAIMS)**

14      Plaintiffs allege violations of their First, Fourth, and Fourteenth Amendment[4] rights under

15  42 U.S.C. § 1983 against defendants Fong, Pedersen, and Lupton.  A successful section 1983

16  claim must establish: "(1) that a person acting under color of state law committed the conduct at

17  issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity

18  protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-33

19  (9th Cir. 1988) (citations omitted).  The "first step in any [section 1983] claim is to identify the

20  specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994)

21  (citations omitted).

22      **A.    Fourth Amendment**

23      "Under the Fourth Amendment, law enforcement may use objectively reasonable force to

24  _____

25  [4] The TAC asserts a section 1983 claim under both the Fourth and Fourteenth Amendments.  My
    prior order on defendants' motions to dismiss explained that plaintiffs' alleged Fourteenth
26  Amendment violations are based on the officers' use of excessive force and therefore must be
    analyzed under the Fourth Amendment standard, as I do here.  Dkt. No. 69 at 7 (citing *Graham v.*
27  *Connor*, 490 U.S. 386, 395 (U.S. 1989) (concluding "that all claims that law enforcement officers
    have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other
28  'seizure' of a free citizen should be analyzed under the Fourth Amendment and its
    'reasonableness' standard, rather than under a 'substantive due process' approach")).

carry out such seizures; as in the unlawful arrest analysis, this objective reasonableness is determined by an assessment of the totality of the circumstances." *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted).  To determine whether an officer's use of force was reasonable, courts must balance the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake.  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal quotations and citations omitted).  This balancing act requires courts to "assess the quantum of force used" and then "measure the governmental interests at stake" by considering the following three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Graham*, 490 U.S. at 396).

Considering the three *Graham* factors and the totality of the evidence presented, the amount of force used was not excessive.  The reasonableness of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (citation omitted).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, [] violates the Fourth Amendment."  *Id.* at 396-97 (internal quotation marks and citation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.*

The plaintiffs' detentions were triggered by a call reporting that an armed Hispanic male had threatened the caller with a gun as he was driving on the other side of the road.  The partial plate matched Godoy's car's, and the caller had identified Godoy in a photo array.  When Fong and Ball spotted the vehicle and Godoy, they saw Godoy gesture towards the vehicle as if to activate its alarm and the vehicle's hazard lights flash shortly thereafter.  In light of these facts, it was reasonable for the officers to have believed that Godoy was armed and could pose an immediate threat to the safety of the officers or others.  Further, a crowd quickly gathered at the scene.  The officers' decisions to command plaintiffs to get on the ground, to call for back up, and

United States District Court
Northern District of California

1    to keep their guns drawn before searching anyone are reasonable precautions in light of the known

2    circumstances at the time.  *See Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir.

3    1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his

4    own safety or the safety of the public, measures used to restrain individuals, such as stopping them

5    at gunpoint and handcuffing them, are reasonable.").

6          Plaintiffs' excessive force claim focuses on three primary interactions: (1) Godoy and

7    J.C.'s testimony that a knee was pressed on their backs during their handcuffing; (2) Godoy's

8    claim that Lupton continued to point his gun at him after he was handcuffed; and (3) K.A.'s

9    testimony that Lupton initially pulled her hand in the wrong direction when she was being

10   handcuffed.  Oppo. at 12-14 [Dkt. No. 92].  Taking all inferences in a light most favorable to

11   plaintiffs, these actions do not constitute excessive force in this situation.

12         First, an officer's use of a knee to temporarily restrain an individual while handcuffing him

13   can be a part of normal handcuffing procedure.  *See Jackson v. City of Bremerton*, 268 F.3d 646,

14   652 (9th Cir. 2001) (describing a situation where an arrestee was pushed to the ground and an

15   officer placed his knee on her back while handcuffing her as "normal handcuffing procedure");

16   *Lopez v. City of Imperial*, No. 13-cv-00597, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015)

17   (recognizing that using a knee to restrain and handcuff an arrestee does not categorically raise

18   excessive force concerns).  Plaintiffs have not shown that either Godoy or J.C. suffered any lasting

19   injuries from the officers' use of their knees during the detention.  Considering the lack of injuries

20   and the minimal length of time the officers' knees were applied to their backs, Godoy's and J.C.'s

21   descriptions of the incident do not raise a material dispute that the officers' conduct in handcuffing

22   them constituted excessive force.

23         Second, plaintiffs do not raise a material dispute that Lupton continued to point a gun at

24   Godoy even after he was handcuffed.  Godoy's testimony on this issue is inconclusive at best.

25   None of the other plaintiffs provided clear testimony on this issue.

26         Third, while K.A. testified that initially her right hand was pulled the wrong way, she was

27   able to pull her right arm away and voluntary placed both her right arm and her left arm behind her

28   back.  Considering that K.A. did not testify she had any difficulty pulling her arm away from the

1   officer and voluntary placed her other arm behind her back, no reasonable juror could conclude

2   that the officer's initial tug on its own constituted excessive force.

3          Plaintiffs' attempt to analogize this case to *Robinson v. Solano County*, 278 F.3d 1007 (9th

4   Cir. 2002) is unconvincing.  In *Robinson*, Robinson's neighbor called the police after he shot two

5   of the neighbor's dogs that were attacking Robinson's livestock.  278 F.3d at 1010.  When the

6   officers arrived, Robinson, a 64-year old man wearing jeans and an unbuttoned shirt, walked

7   approximately 135 feet from his front door to the sidewalk to meet them.  *Id.*  The officers were

8   able to see him approach and observed that he was unarmed and had a calm demeanor.  *Id.*  After

9   Robinson had walked within six feet of the officers and introduced himself, one officer aimed a

10  gun directly at his head and another officer aimed his gun generally at Robinson.  *Id.*  One of the

11  officers continued towards Robinson and "thrust" his gun within three to four feet of Robinson's

12  head.  *Id.*  The Ninth Circuit held that because Robinson was acting peacefully and no other

13  "dangerous or exigent circumstances" were apparent, he had adequately alleged a violation of his

14  Fourth Amendment rights.  *Id.* at 1014-15.

15         The facts here are not analogous to *Robinson*.  None of the plaintiffs claims that a gun was

16  thrust or pointed at their face in such close proximity as happened in *Robinson*.  Significantly, the

17  officers here were responding to a report of an armed individual who had threatened someone with

18  a gun.  The officers did not have the luxury of observing the plaintiffs for a significant period of

19  time to see if they were unarmed before searching them.  In addition, a crowd had gathered around

20  the police officers during the detention and the public's safety, as well as the officers', had to be

21  secured.  Dangerous or exigent circumstances were undeniably present.

22         Even if plaintiffs had demonstrated a Fourth Amendment violation, defendants would be

23  entitled to qualified immunity unless a reasonable officer would have known at the time of the

24  incident that his conduct violated clearly established law.  The doctrine of qualified immunity

25  protects government officers who do not knowingly violate the law.  *Gasho v. United States*, 39

26  F.3d 1420, 1438 (9th Cir. 1994).  Qualified immunity requires a two-part analysis: "1) Was the

27  law governing the official's conduct clearly established? 2) Under that law, could a reasonable

28  officer have believed the conduct was lawful?"  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871

United States District Court
Northern District of California

11

1    (9th Cir. 1993).  This is "an objective standard" that leaves "ample room for mistaken judgments."

2    *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1376 (9th Cir. 1990) (internal citation and

3    quotation marks omitted).

4         It is the plaintiff's "burden to show that the contours of the right were clearly established"

5    at the time of the alleged misconduct.  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109

6    (9th Cir. 2011).  The only established case law plaintiffs rely on is *Robinson*, which is inapposite.

7    Viewing the evidence in the light most favorable to plaintiffs, it fails to create a genuine dispute

8    that, considering the potential danger of an armed suspect and the comparatively minimal force

9    used, reasonable officers in this situation would have known at the time of the incident that their

10   conduct violated clearly established law.  As a result, the officers are entitled to qualified

11   immunity.

12        **B.    First Amendment**

13        To prevail on a First Amendment retaliation claim, a plaintiff must show: "(1) he engaged

14   in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the

15   defendant that would chill a person of ordinary firmness from continuing to engage in the

16   protected activity; and (3) there was a substantial causal relationship between the constitutionally

17   protected activity and the adverse action."  *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir.

18   2010).  In assessing whether speech is chilled, courts look to "whether an official's acts would

19   chill or silence a person of ordinary firmness from future First Amendment activities." *Lacey v.*

20   *Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012) (internal quotation marks and citations omitted).

21   However, "[a] plaintiff may not recover merely on the basis of a speculative 'chill' due to

22   generalized and legitimate law enforcement initiatives."  *Mendocino Environmental Center v.*

23   *Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

24        Plaintiffs recognize that the 911 call establishes a legitimate basis for the detention.  Oppo.

25   at 6.  They argue instead that there was no justification for the "heavy-handed excessive force"

26   that was used and that defendants "maliciously" applied this excessive force to punish or retaliate

27   against plaintiffs for the protected speech activities.  *Id.*  But because there was a legitimate basis

28   for the stop and no excessive force was used, plaintiffs' First Amendment claim fails as a matter of

United States District Court
Northern District of California

law.

Defendants' motion for summary judgment on plaintiffs' section 1983 claims is GRANTED.

## II.     MUNICIPAL LIABILITY (THIRD CLAIM)

Plaintiffs allege that the County of Sonoma had a "custom and practice of targeting protestors and punishing them for exercising their First Amendment rights."  TAC ¶ 90. Defendants move for summary judgment on this claim alleging that municipal liability cannot be established by a single incident without more.  Plaintiffs do not address this claim in their opposition brief.

"[A] municipality cannot be held liable under [section] 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  "Rather, the Supreme Court has required a plaintiff seeking to impose liability on a municipality under [section] 1983 to identify a municipal policy or custom that caused the plaintiff's injury."  *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1232-33 (9th Cir. 2011) (internal quotation marks and citations omitted).  For a municipality to be liable, the plaintiff must establish: "(1) that he or she possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation."  *Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005) (internal citations, quotations marks, and modifications omitted).

Plaintiffs have failed to show the existence of a policy or custom giving rise to municipal liability.  None of the evidence demonstrates a custom of encouraging the surveillance of protesters, facilitating a "code of silence" among the Sonoma County Sheriff's Office to hide the use of excessive force, or maintaining grossly inadequate handcuffing procedures as alleged in the TAC.  TAC ¶ 91.  The evidence relating to the January 9th incident is inadequate to establish municipal liability under *Monell* without proof that the incident was caused by an existing policy or can be attributed to a municipal policy maker.  *See Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability

under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Davis v. Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989) ("[A] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a nonpolicy making employee.").

Defendants' motion for summary judgment on this claim is GRANTED.

## III.   BATTERY (FOURTH CLAIM)

Under California law, officers are explicitly permitted to use reasonable force to effect an arrest, prevent escape, or overcome the resistance of a person being arrested. Cal. Penal Code § 835a. Accordingly, a law enforcement officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73 (Cal. Ct. App. 1998). Battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims and require the same evidentiary showing. *See id.* at 1274; *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999). Because the use of force was not unreasonable or excessive, plaintiffs cannot prevail on their battery claim. Defendants' motion for summary judgment on this claim is GRANTED.

## IV.   NEGLIGENCE (FIFTH CLAIM)

Plaintiffs' fifth claim, for negligence, is asserted only against "Defendants Does 1 through 20." Defendants Lupton, Fong, and Pedersen moved for summary judgment, citing the lack of allegations against them. Plaintiffs did not address this claim at all in their opposition brief, and provided no further clarity at the hearing on whether this claim is alleged against these three officers. Considering the claim as pleaded is asserted only against "Defendants Does," defendants' motion for summary judgment on this claim is GRANTED.

## V.   BANE ACT (SIXTH CLAIM)

California Civil Code section 52.1, also known as the Bane Act, prohibits interference or attempted interference "by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States." Cal.

United States District Court
Northern District of California

14

Civ. Code § 52.1.  To prevail on a Bane Act claim plaintiffs must demonstrate that: (1) defendants "interfered with Plaintiffs' constitutional or statutory rights;" and (2) "that interference was accompanied by actual or attempted threats, intimidation or coercion."  *Campbell v. Feld Entm't, Inc.*, 75 F. Supp. 3d 1193, 1211 (N.D. Cal. 2014) (citation omitted).  Because plaintiffs fail to establish a violation of their constitutional or statutory rights, defendants' motion for summary judgment on this claim is GRANTED.

## VI.      FAILURE TO PREVENT OR INTERCEDE (SEVENTH CLAIM)

"Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen."  *United States v. Koon*, 34 F.3d 1416, 1447 (9th Cir. 1994).  Plaintiffs' "failure to intercede" claim is asserted against Lupton and Fong and is based on allegations that these defendants "were aware through their observations that the Plaintiffs['] civil rights were being violated" and they "had a duty to intercede" but did not do so.  TAC ¶ 113.  No specific facts are alleged in support of this claim. Although defendants moved for summary judgment on this claim, plaintiffs did not address it in their opposition brief.  Because plaintiffs did not raise a material dispute that their rights were violated for this reason, this claim fails as a matter of law.

Defendants' motion for summary judgment on this claim is GRANTED.

### CONCLUSION

For the reasons described above, defendants' motion for summary judgment is GRANTED.  Judgment shall be entered in accordance with this Order.

**IT IS SO ORDERED**.

Dated: July 22, 2016

WILLIAM H. ORRICK
United States District Judge